IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
_____

JOHN M. ANDERSON, PATRICK
KORKOWSKI, KENNETH DALBERG,
EDGAR SALINAS-LEAL, BRAD
SCHMITT, JAYVON FLEMMING,
JASON NATCONE, JUSTIN WELCH,
ASHTON DREILING, and KEVIN BURKES,
on their own behalf and on behalf of others
similarly situated,

      Plaintiffs,

v.

WISCONSIN DEPARTMENT OF
CORRECTIONS; KEVIN A. CARR,
SECRETARY, WISCONSIN DEPARTMENT
OF CORRECTIONS; JARED HOY, DEPUTY
SECRETARY, WISCONSIN DEPARTMENT
OF CORRECTIONS; MELISSA ROBERTS,
ASSISTANT DEPUTY SECRETARY,
WISCONSIN DEPARTMENT OF CORRECTIONS;
RANDALL HEPP , WARDEN,
WAUPUN CORRECTIONAL, and YANA
PUSHICH, SECURITY DIRECTION, WAUPUN
CORRECTIONAL in their official capacities.

      Defendants.

No.

**CLASS ACTION**

**CLASS ACTION COMPLAINT
FOR INJUNCTIVE AND
DECLARATORY RELIEF**

**NATURE OF THE ACTION**

1. Prisoner Plaintiffs and the Plaintiff Class are housed in Wisconsin Department of

Corrections ("WDC") state prisons and seek declaratory and injunctive relief against Kevin A.

Carr, Jared Hoy, Melissa Roberts, Randall Hepp and Yana Pushich, (collectively, "Defendants")

2

in their official capacities. Prisoner plaintiffs and the Plaintiff Class are entirely dependent on Defendants for their basic health care. However, the system under which Defendants provide, or do not provide, medical, mental health, and dental care (collectively, "health care") to prisoners is grossly inadequate and subjects all prisoners to a substantial risk of serious harm, including unnecessary pain and suffering, preventable injury, amputation, disfigurement, and death. For years, the health care provided by Defendants in Wisconsin's prisons has fallen short of minimum constitutional requirements and failed to meet prisoners' basic health needs. Critically ill prisoners have begged prison officials for treatment, only to be told "be patient," "it's all in your head," or "pray" to be cured. Despite warnings from their own employees, prisoners and their family members, and advocates about the risk of serious injury and death to prisoners, Defendants are deliberately indifferent to the substantial risk of pain and suffering to prisoners, including deaths, which occur due to Defendants' failure to provide minimally adequate health care, in violation of the Eighth Amendment. "Just as a prisoner may starve if not fed, he or she may suffer or die if not provided adequate medical care. A prison that deprives prisoners of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society." *Brown v. Plata*, 563 U.S. __, 131 S.Ct. 1910, 1928 (2011).

2. Wisconsin prisoners also suffer serious harm and are subject to a substantial risk of serious harm as a result of Defendants holding prisoners in isolation in Waupun Correctional Institution ("WCI") in cruel and unusual conditions of confinement. Defendants continue to be deliberately indifferent to the substantial risk of pain and suffering, including deaths, which occur due to their systemic failure to provide minimally adequate conditions to prisoners in isolation, in violation of the Eighth Amendment.

3.  Plaintiffs seek injunctive relief to compel Defendants to immediately provide prisoner-Plaintiffs and the class members they represent with constitutionally adequate health care and with protection from unconstitutional conditions of confinement. Prisoner Plaintiffs and the Plaintiff Class are housed in the Waupun Correctional Institution, a branch of the Wisconsin Department of Corrections.  The Plaintiff class seeks declaratory and injunctive relief against the Wisconsin Department of Corrections, Kevin Carr, Jared Hoy, Melissa Roberts, Randall Hepp, and Yana Pusich, (collectively, "Defendants") in their official capacities.

4.  Prisoner Plaintiffs have been subjected to a prolonged, unnecessary and unexplained, lockdown which has resulted in a violation of their civil rights.  The Plaintiff Class has been exposed to horrible conditions including, but not limited to, the following:  Nearly seven (7) months of continued Modified Movement ("Lockdown 24 hours per day"), unacceptable delays in medical treatment, willful violations of dietary restrictions, unsanitary living conditions, one shower per week, one hour of recreational time per week, undue stress and anxiety, no in-person family visits, no electronic family visits, no religious services, no availments of educational programs, interference with attorney-client meetings, no availments of the on-site law library, forced use of contaminated water, environmental spoilation by bird defecation and feces, rampant roach and mice infestations, subjection to self-harm as a remedy for help, subjection to suicide as a relief mechanism to escape the effects of the lockdown, dental neglect and withheld medication(s). The Plaintiff Class has also experienced at least one, possibly two, deaths by suicide during the unexplained lockdown as mental health services go unmet.  In addition to suicide attempts, the Plaintiff Class has experienced increased anxiety, depression, and lack of sleep.

5. Defendants have failed to meet the basic needs of the Plaintiff Class and, as a result, have exposed the Plaintiff Class to a substantial risk of serious harm, including unnecessary pain and suffering, preventable injury, and preventable illness.

6. The Plaintiff Class seek injunctive relief to compel Defendants to immediately provide the Plaintiff Class with constitutionally adequate conditions, medical treatment, mental health treatment, and sustenance.

7. The Plaintiff Class also requests this Honorable Court for protections from continued unconstitutional conditions of confinement.

8. The Plaintiff Class also requests this Honorable Court appoint a Receiver to oversee any and all directives and/or remedies this court orders against Defendants.

## JURISDICTION

9. This Honorable Court has jurisdiction pursuant to 28 U.S.C. §§1331 and 1343. This civil action seeks declaratory and injunction relief under 28 U.S.C. §§1343, 2201, and 2202; and 42 U.S.C. §1983.

## VENUE

10. Venue is proper under 28 U.S.C. §1391(b), because the Defendants reside in the Eastern District of Wisconsin and because a substantial part, or all of the events giving rise to the Plaintiff Class's claims, occurred in the Eastern District of Wisconsin.

## PARTIES

### Plaintiffs

11. Plaintiff John M. Anderson is a 62 year old inmate at WCI. He was diagnosed with a severe eye medical condition since May 2023. Plaintiff Anderson has been filing health services request forms almost daily complaining of eye pain, blurred vision, impaired/blurred vision and

dark spots. Plaintiff Anderson has received responses from the health services unit for approximately five (5) months informing him that he cannot receive optical services due to the lockdown. Plaintiff Anderson has filed numerous medical emergency forms for which not treatment whatsoever has been provided.

12.  Plaintiff Patrick Korkowski has been at WCI since June 27, 2023 with a preexisting dental issue. Plaintiff Korkowski was told at his previous facility of incarceration that he would have to seek continued dental care once he arrived at WCI. Upon his arrival at WCI in June 2023, Plaintiff Korkowski immediately notified correctional staff and medical staff that he had a serious, painful tooth problem. The problem tooth had decayed to the point the nerve root became exposed and subjected him to severe, constant oral pain. This unnecessary pain and suffering lasted at WCI from June 2023 through September 2023, some four (4) months without treatment until the tooth was removed the latter month due to the lockdown. After several teeth were removed Plaintiff Korkowski developed an infection in both sockets of the removed teeth. Plaintiff Korkowski advised a health services unit ("HSU") nurse that he felt he had an infection shortly after the extractions only to be told it was normal pain for having the teeth removed. It took several weeks for Plaintiff Korkowski to be diagnosed with an infection and to receive medication for same.

13.  Plaintiff Kenneth Dalberg is a 62 year old inmate who suffers from degenerative joint disease and has artificial implants in both shoulders, is diabetic and has continued heart disease. After diagnosis of increased heart disease, Plaintiff Dalberg was required to have coronary angioplasty and stents. After the surgery, Plaintiff Dalberg was prescribed a platelet inhibitor for which WCI HSU refused to provide for sixty (60) days thereafter. Plaintiff Dalberg's diabetes has been kept in check for fifteen (15) years until the WCI lockdown, whereupon, he has been provided no diabetic dietary sustenance; instead, he has been routinely provided peanut butter and jelly

sandwiches with the choice to either eat them or go hungry. This situation has been for going on seven (7) months and continues. This diet has caused severe and dangerous spikes in his blood sugar levels and present immediate and substantial harm to his health and well-being.

14. Plaintiff Edgar Salinas-Leal has been diagnosed with kidney stones and complained to HSU at WCI for years without having received any treatment. His continued requests for pain management have been wholly ignored. Additionally, Plaintiff Salinas-Leal suffers from severe migraine headaches for which he received regular and routine treatment shots at Madison Wisconsin U.W. hospital. Since COVID lockdowns at WCI, Plaintiff Salinas-Leal's appointments have been cancelled and not resumed. His migraine headaches go untreated and no other pain management has been provided by WCI HSU. All inquiries made by Plaintiff Salinas-Leal have gone unanswered.

15. Plaintiff Brad Schmitt suffered three (3) broken teeth in January 2023. He has suffered, and continues to suffer, pain from his dental issues. Plaintiff Schmitt has great difficulty eating and drinking. He was briefly placed on Ibuprofen by HSU staff, only to have that medication taken away and denied. Plaintiff Schmitt has repeatedly asked HSU to provide treatment for his dental needs only to be told he would be put on the waiting list for which there is an eighteen (18) month long waiting list.

16. Plaintiff Jayvon Flemming has a heart condition and submitted HSU forms requesting to be seen on an emergency basis due to severe chest pains and difficulty breathing for which he was later evaluated after waiting five (5) days. Plaintiff Flemming also suffers from a broken tooth which penetrates his gum causing extreme pain for which he has been placed on the dental waiting list which may take as long as eighteen (18) months to be seen. Plaintiff Flemming also suffers from severe mental health issues. He is listed as MH-2 per Wisconsin Department of Corrections

7

policy. Since the lockdown, now going on seven (7) months, Plaintiff Flemming has not been receiving treatment, he further has a lengthy history of suicide attempts and self-harm.

17.    Plaintiff Jason Natcone suffers from gastrointestinal issues. Particularly, Plaintiff Natcone had his colon removed via colonoscopy and wears a colostomy bag. Plaintiff Natcone has been denied visits to HSU for follow-up care due to the lockdown. Further, Plaintiff Natcone has not had off-site critical care appointments as required by his medical condition including dental cleaning to prevent compromise of his immune system. Additionally, Plaintiff Natcone requires a medical ordered meals which were cancelled without being notified or seeing a nurse at HSU. Because of the meals being cancelled, Plaintiff Natcone had to eat meals that jeopardized his health until, after a great length of time, Plaintiff Natcone's family were able to convince administration to have his medical meals reinstated.

18.    Plaintiff Justin Welch has been diagnosed as having a fatty liver and borderline diabetic. Due to the lockdown, lack of exercise and poor diet, Plaintiff Welch was advised by a treating physician his condition is worsening and will continue to worsen until he is able to change his diet, get exercise and continued medical treatment. Unfortunately, like so many other inmates at WCI, Plaintiff Welch regularly and routinely is served peanut butter and jelly sandwiches along with other diabetes adverse food stuffs. Also, like many other inmates, Plaintiff has not had dental care in two (2) years and has been on the dental waiting list for a year with no currently scheduled appointment to address his dental issues. Plaintiff Welch has been subjected to prolonged lockdown which has impacted his physical and mental health.

19.    Plaintiff Ashton Dreiling is a prisoner in WCI.  Mr. Dreiling has had his mental health negatively impacted by the prolonged lockdown.  Mr. Dreiling, due to the inhumane conditions at

WCI, has attempted suicide approximately four times due to a lack of sunlight, an inability to go outdoors, and other problems presented by the prolonged and unnecessary lockdown.

20. Plaintiff Kevin Burkes is a prisoner in WCI. Mr. Burkes requested medical treatment, specifically optical assistance, during the lockdown. Mr. Burkes has an autoimmune disorder and lives with blurry vision and pain. Mr. Burkes was denied treatment via a note that said, "No optical during lockdown." This refusal showed a willful disregard for the health and safety of Plaintiff Burkes.

**Defendants**

21. Defendant Wisconsin Department of Corrections ("WDOC") is an entity run by the State of Wisconsin. The Department states it, "works to protect the public through the constructive management of those placed in its charge. We offer education, programming, and treatment to persons in our care that enables them to be successful upon returning to the community. Our mission is to achieve excellence in correctional practices while fostering safety for victims and communities."[1]

22. Defendant Kevin Carr is the Secretary of the WDOC. Defendant Carr is responsible for the management of the WDOC.

23. Defendant Jared Hoy is the Deputy Secretary of the WWDOC and is second in charge of the Department.

24. Defendant Melissa Roberts is the Assistant Deputy Secretary of the Wisconsin Department of Corrections. Defendant Roberts is responsible for serving as the Secretary on corrections policy. Defendant Roberts is also responsible for implementing initiatives from the Governor's Office.

---

[1] https://doc.wi.gov/Pages/Home.aspx

25. Defendant Randall Hepp is the Warden at WCI. As warden at WCI, Defendant Hepp is responsible for all staff and inmates at WCI. Defendant Hepp is responsible for the supervision and training of staff under his management. Defendant Hepp is also responsible for ensuring the health, safety, and well-being of all inmates at WCI.

## FACTUAL ALLEGATIONS

26. Defendant Wisconsin Department of Corrections ("WDOC") is an entity run by the State of Wisconsin. The Department states it, "works to protect the public through the constructive management of those placed in its charge. We offer education, programming, and treatment to persons in our care that enables them to be successful upon returning to the community. Our mission is to achieve excellence in correctional practices while fostering safety for victims and communities."[2]

27. WCI's Purpose Statement alleges, "The purpose of Waupun Correctional Institution (WCI) is to provide inmates, staff, and the public with a safe and secure institution, *while encouraging positive growth and enabling inmates to successfully reenter society*."[3]

28. The policies and practices of Defendants directly contradict their own Purpose Statements. For months, WCI has been on an unwarranted, unnecessary and detrimental lockdown that has resulted in the violations of Plaintiffs' and the Plaintiff Class's Constitutional Rights.

### I. Defendants Deprive Plaintffs and the Plaintiff Class of Constitutionally Adequate Health Care in Violation of the Eighth Amendment

29. Plaintiffs and the Plaintiff Class allege the following. Defendants have implemented a policy and practice of failing to provide Plaintiffs and the Plaintiff Class with adequate health care, including mental health care, and are deliberately indifferent to the fact that their

---

[2] *Id.*
[3] https://doc.wi.gov/Pages/OffenderInformation/AdultInstitutions/WaupunCorrectionalInstitution.aspx

implemented policies have resulted in significant injuries and a substantial risk of serious harm to Plaintiffs and the Plaintiff Class.

### A. Plaintiffs and the Plaintiff Class Face Lengthy and Dangerous Delays in Receiving and Outright Denials of Health Care

30. Defendants have a policy and practice of failing to provide timely access to health care and are deliberately indifferent to the risk of harm and injury to prisoners that results from this systemic failure. To request health care, prisoners must submit a HSU form, describing the need for medical, dental, or mental health attention, regardless of whether they have informed medical staff about their symptoms. Prisoners face numerous barriers in submitting this required form: oftentimes, there are no HSU forms in living units; staff give prisoners photocopies of HSU forms that are later rejected for not being originals; correctional officers refuse to provide forms to prisoners or discourage them from filing them; and officers read completed HSU forms and tell prisoners they are not sick, and refuse to accept or forward the HSU forms to health care personnel.

31. In addition, officers sometimes prohibit prisoners from assisting fellow inmates in completing HSU forms, even though the officers are aware that this prevents some prisoners from filing requests. This prohibition also harms prisoners who are acutely ill, experiencing severe mental health problems, vision-impaired, developmentally disabled, illiterate, have injuries or permanent disabilities that make it difficult to write, or are otherwise unable to fill out the forms, especially because staff members will not provide assistance.

32. In addition to restricting the ability of prisoners to request health care, Defendants have a policy and practice of failing to provide care after receiving notice of prisoners' needs, and are deliberately indifferent to the harm that results. Even if the completed HSU form is forwarded to health care staff, it is not processed in a timely manner, so prisoners have to file multiple HSU

forms and face long delays of many weeks and often months before they receive medicine or are examined by qualified clinicians, and experience harm and unnecessary pain and suffering as a result.

33. Oftentimes, medical staff members respond to a HSU stating only that the prisoner is on a waiting list to see a physician, dentist, psychiatrist, or outside specialist, even in response to HSU forms alleging serious injuries that require immediate action. Plaintiffs Salinas-Leal, Schmitt, Flemming, Natcone, Anderson and Korkowski have received responses telling them to "be patient" to HSU forms alleging serious pain or injuries. Plaintiff Dreiling, who has a history of self-harm and multiple suicide attempts, filed a HSU form reporting that he needed help with his psychotropic medication. He received a written response stating there are no Psychiatric Services Unit ("PSU") visits "due to the lockdown". Plaintiff Dalberg who had a stent implanted at an outside hospital after a heart attack was ordered by the surgeon to see a cardiologist for follow-up. Plaintiff Dalberg has filed multiple HSU forms asking to be referred to a cardiologist, but the most recent response he received to his HSU request indicated no off-site appointments were being scheduled due to the "lockdown".

34. Defendants have been warned repeatedly about these unreasonable delays in access to healthcare. Since March 2023, literally hundreds of Inmate Complaints have been written and forwarded to the attention of the Warden and Deputy Warden to no avail.

35. Lengthy delays in responding to HSU requests and providing necessary health care are the system-wide norm, as reflected in countless examples. Plaintiff Schmitt filed multiple HSU forms over several months about oral pain only to be told "Providers want you to purchase meds from canteen, OTC pain meds etc. Have you seen dentist or are you on the dental waiting list?". Plaintiff Schmitt had a prescription for pain medication and when that ran out he was told in

response to his HSU request "Dental can provide medication only to patients awaiting extraction. Tylenol is available on canteen".

36. This failure to timely respond to HSU forms is compounded by Defendants' failure to create an effective tracking and scheduling system for health care appointments or of prisoners' medical records. There also are no standardized protocols or timeframes dictating deadlines by which a prisoner requesting care must receive a face-to-face appointment with a nurse, doctor, or other clinician. As a result, inadequately-trained lower-level staff triage the HSU requests and decide whether to schedule an examination, without sufficient information.

37. The harm from the delays in care is aggravated by Defendants' policy and practice of having WCI clinicians make treatment decisions without examining prisoners, instead relying on brief notes or descriptions from lower-level medical assistants and even correctional officers who have no medical training. In the unsupervised gatekeeping role Defendants force on them, these lower level medical and custody staff often do not recognize or acknowledge the symptoms a patient displays until the condition has become so acute as to be life threatening or results in permanent injury. For example, Plaintiff Anderson wrote in an HSU request "Dr. Kuffenhim will you please make an eye doctor appointment with me for my eyes. My vision has gotten worse and extreme pain even with glasses 7/10 (level of pain) all day long". HSU staff responded "Currently no optical services because of lockdown placed on wait list".

38. Plaintiff Anderson has a complicated ophthalmological history including surgery for various issues and has written dozens of HSU requests, Interview/Information Requests and Inmate Complaints all to no avail and one response, for example, states "Eye concern sent to south OD, no new orders, appointments pending urology + PCP + PT for arm". Plaintiff Anderson's

complaints and requests span several months and still have not been adequately addressed nor has he been seen by an eye doctor.

39. In their Inmate Handbook, Defendants outline their process for an inmate at WCI to obtain a medical appointment.[4] According to their handbook, an inmate at WCI must submit a Health Service Request form (DOC-3035) from a housing unit officer. *Id.* After filling out the form, to include a "brief, but specific, description of your problem (i.e., sore back, toothache, request to review medical file, etc.)" *Id.* A nurse then reviews requests and "either schedules an appointment, sends a written response, or forwards the request to other staff (i.e., dental, optical, medical record reviews, medication reviews, etc)." *Id.* After being charged $7.50 for the appointment, an inmate at WCI will first see a registered nurse. *Id.* The nurse then determines if an appointment is necessary, an appointment with a physician is scheduled. *Id.* "Unless your medical need is determined to be an emergency, an appointment is scheduled approximately 3-5 days after the Health Services Request is received." *Id.* The WCI handbook also states medical emergencies "will be handled as they arise." *Id.* An emergency is defined as, "an unexpected, serious happening demanding immediate medical action." *Id.* The handbook additionally states, "If you are unable to report to the Health Services Unit, medical personnel will come to your aid." *Id.* Despite outlining these expectations to their inmates, WCI has systematically failed in providing effective or adequate, even at times denying, medical treatment for the Plaintiffs and the Plaintiff Class. For example on October 12, 2023, a prisoner reported numbness in his left arm and was seen by HSU. He was told they would notify the doctor but nothing appeared wrong with him. On October 13, 2023, that same prisoner awoke with numbness on the whole left side and had difficulty breathing. He reported this, again, to HSU and was again told nothing was wrong

---

[4] https://doc.wi.gov/Documents/OffenderInformation/AdultInstitutions/WCIInmateHandbookEnglish.pdf, pages 25-26.

with him. On October 15, 2023, that prisoner had a seizure (although no history of seizures) and lost the majority of function on the left side of his body, again being told nothing was wrong with him. No further treatment or examinations have been provided to that prisoner as of October 25, 2023.

40. Members of the Plaintiff Class have been denied medical services during the unexplained and unnecessary lockdown. The delay, inadequate administration, or denial of healthcare-related services violate the Plaintiff and Plaintiff Class's fundamental rights under the Eighth Amendment of the United States Constitution.

**C. Defendants Fail to Provide Necessary Medication and Medical Devices to Prisoners**

41. Defendants have a policy and practice of failing to prescribe, provide, and properly manage medication, or of only providing incorrect, interrupted, or incomplete dosages of medication. Defendants also have a policy and practice of failing to provide necessary medical devices and supplies. Prisoners experience delays and gaps in receiving medicine or supplies, including those prescribed by outside doctors. Delays and gaps also occur when prisoners transfer from one prison to another. Prisoners face abrupt discontinuation of their medications for weeks or months, before being seen by a new provider. For example, prisoner Dean Hoffman was transferred in May 2023 from Dodge Correctional Institution to WCI, but had to file multiple HSU forms and wait weeks before he began receiving the psychotropic medications prescribed by physicians at Dodge Correctional Institution. Hoffman had been clinically diagnosed as manic depressive and bipolor for most of his adult life prior to being incarcerated for the first time in his life at the age of sixty (60) years. By the second to third week of June 2023, Hoffman's medications were once again discontinued. On June 28, 2023, Hoffman filed an HSU form requesting Depakote. No Depakote was provided to Hoffman on that date. At approximately 7 a.m. the

following morning, June 29, 2023, Hoffman was found hanging in his with a sheet tied around his neck. He was pronounced dead approximately 30 minutes later.

42. Defendants have a policy and practice of not providing prisoners with the full course of their medication, not providing prisoners medication as prescribed or in a timely fashion, and inappropriately starting and stopping medication. As a result, prisoners suffer unnecessary harm, and in the cases of prisoners with psychotic and mood disorders, suffer withdrawal symptoms and the recurrence of symptoms such as hallucinations and suicidal ideation. For example, prisoner Hoffman's medications were abruptly discontinued without any clinical explanation and he was not seen for his resulting psychiatric problems for at least two weeks.

43. Psychotropic medications that are to be taken daily regularly go undelivered, without explanation or warning. Plaintiff Flemming has had medications abruptly started, stopped and restarted, including a potent antipsychotic medication. Plaintiff Flemming was switched multiple times to treat his psychosis, but with no documented explanation for the changes, and with a more rapid titrating on and tapering off the medications than is consistent with the therapeutic indications of use.

44. Defendants have a policy and practice of not providing medically necessary devices, thus depriving these prisoners of basic sanitation. Plaintiff Natcone and other prisoners who need catheters are given fewer clean catheters than they need, and thus have to re-use the catheters, putting them at risk of bladder and urinary tract infections. Plaintiff Natcone has repeatedly not been provided an adequate number of catheters. Prisoners who need incontinence briefs or wipes often go without them, or are told they only are allowed one diaper per day.

**D. Defendants Employ Insufficient Health Care Staff**

45. Many of the severe deficiencies in WCI's health care system are caused by Defendants' failure to employ sufficient health care staff positions to provide adequate health care to prisoners. There are simply insufficient medical, dental, and mental health clinicians (i.e. physicians, psychiatrists, dentists, physicians' assistants, registered nurses, and other qualified clinicians) on staff to meet the significant and documented health care needs of the almost 22,000 prisoners in WDOC custody.

46. Defendants' policy and practice of chronically and consistently understaffing health care positions results in multiple deficiencies and inadequate health care: there is not enough staff to timely respond to prisoners' requests for health care and to emergencies, to provide uninterrupted medication delivery, or to adequately screen, monitor and provide follow-up care to prisoners with serious and chronic illnesses. The inadequate health care staffing is caused by or prescribe medications under current state law, and should be supervised by a psychologist.

47. Defendants have knowingly ignored the warnings of their own staff and others about the staffing shortages, and as a result prisoners continue to suffer from constitutionally inadequate health care and substantial risk of serious harm due to Defendants' deliberate indifference to the impact of the system-wide staffing shortages.

**B. Plaintiffs and the Plaintiff Class Face Denials or Significant Delays in Receiving Psychological Services**

48. In the WCI handbook, an inmate is directed to fill out a "Psychological Services Request form" if they wish to see their respective psychologist. *Id.* at page 30. The handbook also recommends an individual "specify the issues you would like addressed so that your psychologist can respond appropriately." *Id.* After the request is received, it is triaged and then forwarded to an assigned psychologist unless it is an emergency or crisis situation. *Id.*

17

49. The handbook mistakenly informs inmates, "If you are having thoughts of suicide or harming yourself, please notify staff immediately and the first available PSU staff will respond to assess your safety." *Id.* The handbook goes on to Psychological Services Unit (PSU) staff "cannot provide immediate response for non-crisis situations; you should submit a PSR describing your issue and you will be scheduled as appropriate." *Id.*

50. The handbook also directs inmates to contact the PSU for questions related to program needs. *Id.*

51. Defendants have failed Plaintiffs and the Plaintiff Class by failing to provide psychological services in a reliable or timely manner, at times denying the services outright.

**C. Despite Being Aware of the Risk of Suicide, Defendants Have Willfully Failed to Provide Adequate Safeguards Against Suicide or Suicide Attempts During the Lockdown.**

52. Defendants specifically mention in the WCI handbook that suicide attempts "have considerable cost in terms of psychological distress to those who make the attempt or witness it, physical injury, the need for medical care, and disruption of the housing unit." *Id.*

53. Despite being keenly aware of the outcomes of suicide attempts, Defendants implemented a policy and practice of ignoring these attempts during the unnecessary and unexplained lockdown.

54. Plaintiff Flemming has been placed on the Restricted Housing Unit ("RHU") numerous times after threats of self-harm and/or suicide attempts. During these times, Plaintiff Flemming has gone entire days with only being observed at meal times. A prime example of this fact is the death of prisoner Dean Hoffman.

18

55. As a result of circumstances Defendants have created, Plaintiffs and members of the Plaintiff Class have experienced either suicide attempts or, as the WCI handbook states, "psychological distress" for any Plaintiff or member of the Plaintiff Class that witnessed these events.

56. As a result, actions by Defendants have resulted in Plaintiff and members of the Plaintiff Class having their Eighth Amendment rights violated.

**D. Defendants Have Failed to Provide Adequate or Timely Dental Care to Plaintiffs or Members of the Plaintiff Class**

57. WCI inmates are directed to send a "yellow Dental Service Request (DSR) to the Dental Clinic. DSR Forms are located on your housing unit. Do not use the blue Health Service Request (HSR). Completely describe your dental problem, so the dentist will know how to help you." *Id.* at page 28.

58. Urgent dental needs are described as, "Severe dental pain that keeps you awake at night, broken jaw, bleeding that does not stop, swelling of your jaws, gums, or throat." *Id.* Inmates are directed to tell the housing unit officer with urgent dental issues. *Id.*

59. Plaintiffs Schmitt, Welch, Natcone and Korkowski have all been on the dental waiting list since, or before, the lockdown and continue to be ignored for immediate, emergent dental needs and numerous requests.

60. Based on the policy and practice of Defendants during the lockdown, Plaintiffs and members of the Plaintiff Class have not received adequate or timely dental treatment. Defendants' actions have resulted in Plaintiffs and members of the Plaintiff Class having their Eighth Amendment rights violated.

## II. Defendants Have Failed to Provide Adequate Living Conditions for Plaintiff or Members of the Plaintiff Class

61. Defendants have implemented a policy and practice to demonstrate an utter disregard to Plaintiff's and members of the Plaintiff Class's living conditions.

62. In the WCI handbook, WCI dedicated a section to "Staying Healthy in Prison". *Id.* at Pages 28-29. Some ways the handbook notes to say healthy include: "Stay in contact with family and friends; Get an education or skill; Take treatment and programming seriously; Go to recreation; Take every opportunity to become involved in work; and Take Pleasure in Small Things." *Id.*

63. It is clear Defendants have willfully disregarded the standards necessary for Plaintiffs and members of the Plaintiff class to stay healthy based on their recommendations.

64. During the lockdown, visitation with friends and family has been suspended. There is no opportunity for education. Inmates have limited exposure to treatment. Recreation is a limited option as Plaintiffs and members of the Plaintiff class have limited opportunities to leave their cells, let alone go to recreation. Plaintiffs and members of the Plaintiff Class are restricted to one hour of recreation per week and one shower per week.

65. Plaintiffs and members of the Plaintiff Class have been removed from their work positions due to their involvement in this proposed class action.

66. It is nearly impossible to take pleasure in anything while locked in a cell for 24 hours at a time. This has caused substantial stress, anxiety, anger, frustration and despondency throughout the entire inmate population.

67. Plaintiffs and members of the Plaintiff Class have been subjected to inhumane living conditions during the lockdown. Plaintiffs and members of the Plaintiff Class have been exposed to rat and/or mouse and bird droppings in their living areas.

68. A member of the Plaintiff Class observed rat feces in his prepared meal. When he questioned the Correctional Officers present, it was shrugged off. "That's just extra protein," or words to that effect, is what the member of the Plaintiff Class heard. He was so infuriated by the incident that he wrapped up samples of his food and sent it to a court for a request of investigation.

69. A member of the Plaintiff Class that works in the WCI kitchen has indicated that the roach infestation is so bad that cockroaches have to be waived off of the food and food trays prior to the food carts being removed from the kitchen and taken for distribution amongst the inmates.

70. The utter disregard of potential health issues has caused Plaintiff or members of the Plaintiff Class to suffer violations of their Constitutionally protected Eighth Amendment rights.

### III. Defendants Subject Prisoners in Isolation to Unconstitutional Conditions

71. Plaintiff Flemming alleges the following: Defendants have a policy and practice of confining dozens of prisoners in isolation in conditions of enforced idleness, social isolation, and sensory deprivation, and are deliberately indifferent to the resulting substantial risk of serious physical and psychiatric harm.

72. The large majority of prisoners in isolation are not allowed to go to recreation, are often deprived of shaving supplies and other personal hygiene products. Some prisoners in isolation receive no outdoor exercise at all for months on end; others receive insufficient exercise to preserve their physical and mental health by performing what limited movements they are able to within their small cell.

73. Conditions of isolation are designed to minimize human contact and environmental stimulation. Most or all of these prisoners are held in cells with a solid steel door and no window to the outside. Some prisoners have no means of telling the time and become disoriented and confused, not knowing the date or whether it is day or night. The cells are often illuminated 24 hours a day, making sleep difficult and further contributing to prisoners' disorientation and mental deterioration. Chronic sleep deprivation is common. Property is extremely limited. Many prisoners have no radio or television, and many are illiterate or have difficulty reading, leaving them in a state of enforced idleness with nothing to do but sleep, sit, or pace in their cells.

74. Prisoners in isolation often go months or years without any meaningful human interaction. Unless they are fortunate enough to receive a brief medical or legal appointment or a visit, prisoners are isolated from virtually all human contact. Their only regular interaction with another human being occurs when officers deliver their food trays, or place them in restraints and strip-search them while taking them out of their cell.

75. Defendants have a policy and practice of denying prisoners in isolation adequate nutrition, which Defendants justify on the basis that, because these prisoners receive virtually no exercise, they burn fewer calories and therefore need less food. Prisoners in isolation receive only cold meals consisting of "lunchable" type snack trays, small box of raisins, one pint of milk or peanut butter and jelly sandwich or bologna with two slices of bread per day, which do not meet their minimal nutritional needs. Prisoners experience constant hunger pangs and some lose significant weight as a result of Defendants' policy of providing inadequate nutrition.

76. The devastating effects of these conditions of extreme social isolation and environmental deprivation are well known to Defendants. An abundant psychiatric literature spanning nearly two hundred years has documented the adverse mental health effects of isolation,

and WCI prisoners are no exception. Even prisoners who have no mental illness when first placed in isolation often experience a dramatic deterioration in their mental health, developing symptoms such as paranoia, anxiety, depression, and post-traumatic stress disorder. For example, Plaintiff Flemming did not suffer from suicidal ideation when he was first put in isolation many years ago, but as time went on, his mental and physical state deteriorated. He developed suicidal ideation and physically harmed himself several times. Even those prisoners who withstand isolation better than most are subjected to intolerable conditions, as they are forced to endure the hallucinations and screaming of prisoners suffering the debilitating effects of isolation.

77.  Isolation is even more predictably damaging to prisoners with a pre-existing mental illness. For these prisoners, isolation poses a grave risk of exacerbation of mental health symptoms, psychiatric injury such as PTSD, self-harm, and suicide. Deprived of the social interaction that is essential to keep them grounded in reality, many prisoners with mental illness experience catastrophic and often irreversible psychiatric deterioration. Unlike prison officials in many states, Defendants' policy and practice allows the isolation of prisoners with mental illness, and Defendants knowingly hold prisoners designated as seriously mentally ill in isolation.

78. The harm to prisoners in isolation is exacerbated by the policy and practice of Defendants of failing to provide adequate mental health care staffing and treatment. In addition, the harsh regime and severe limits on human contact in isolation render appropriate mental health treatment effectively impossible. Prisoners in isolation do not receive regular contact with psychiatrists or mental health clinicians, nor do they receive the limited group therapy that is sometimes provided to prisoners in other WDOC facilities. These prisoners' rare interactions with mental health staff usually consist of "cellfront" contacts in which the staff member shouts through the cell door, within earshot of both officers and other prisoners.

79. The predictable outcomes of these cruel conditions of isolation are psychiatric deterioration, self-injury, and death. For example, Plaintiff Flemming's attempted to commit suicide on multiple occasions while in isolation. Recently a prisoner with depression who was housed in isolation and repeatedly asked custodial staff and medical staff passing by if he could be seen by mental health because he was suicidal. Nothing was done for him, and he committed suicide by hanging on June 29, 2023, Dean Hoffman.

## CLASS ALLEGATIONS

80. With respect to their claims for damages, Plaintiffs bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(l), and 23(b)(3), on behalf of:

All pretrial detainees who were housed in indefinite isolation confinement in WCI at any time on or after March 29, 2023.

81. The class is so numerous that joinder of all members is impracticable. Upon information and belief, during the past three years, hundreds of detainees in WDOC and WCI custody were placed in indefinite solitary or isolation confinement in these facilities without due process.

82. Pursuant to the Defendants Hepp and Pushich's WCI's policy and practice, none of these detainees received adequate due process before being subjected to such confinement.

83. Most of the putative class members are economically disadvantaged, making individual lawsuits impracticable.

84. Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual suits could lead to potentially inconsistent results.

85. The class members are identifiable using records maintained by WDOC and WCI in the ordinary course of business.

86. Common questions of law and fact exist for all class members herein and predominate over any questions solely affecting individual members thereof.

87. Among the questions of law and fact common to members of the class are:

a. whether WDOC and WCI's policy and practice of placing pretrial detainees in indefinite isolation confinement without adequate due process violated the Fourteenth Amendment;

b. whether placing pretrial detainees in indefinite isolation confinement was for the purpose of punishment and/or had the effect of imposing punishment;

c. whether placing prisoners in indefinite isolation confinement at WCI was reasonably related to a legitimate non-punitive objective;

d. whether prisoners had a liberty interest in avoiding indefinite placement in isolation confinement; and

e. what process prisoners were due before and during placement in indefinite isolation confinement at WCI.

88. Defendants are expected to raise common defenses to the claims of all class members herein, including denying that its policy and practice violated the Constitution.

89. Plaintiffs' claims are typical of those of all putative class members herein, as Plaintiffs' claims arise from the same municipal policy and practice, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

90. T he cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all putative class members herein, namely WDOC and WCI's policy and practice.

91. Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

92. Plaintiffs are capable of fairly and adequately protecting the interests of all putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

93. Counsel for Plaintiffs is experienced in civil rights litigation and prisoners' rights litigation.

## CLASS ACTION ALLEGATIONS
### Plaintiff Class

94. All prisoner Plaintiffs bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a class of all prisoners who are now, or will in the future be, subjected to the medical, mental health, and dental care (collectively "health care") policies and practices of WDOC and WCI (the "Plaintiff Class").

### Numerosity: Fed. R. Civ. P. 23(a)(1)

95. The class is so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1). As of October 26, 2023, there are approximately 950 prisoners in the custody of WDOC at WCI prison, all of whom are dependent entirely on Defendants for the provision of health care. Due to Defendants' policies and practices, all WCI prisoners, numbering in the hundreds annually, receive or are at risk of receiving inadequate health care while in WCI prison.

103. The Plaintiff Class members are identifiable using records maintained in the ordinary course of business by the WCI.

### Commonality: Fed. R. Civ. P. 23(a)(2)

96. There are questions of law and fact common to the members of the class. Such questions include, but are not limited to:

(a) whether Defendants' failure to operate a health care system providing minimally adequate health care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b) whether Defendants have been deliberately indifferent to the serious health care needs of class members. Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

## Typicality: Fed. R. Civ. P. 23(a)(3)

97. The claims of the Plaintiffs are typical of those of the Plaintiff Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

98. Plaintiffs are capable of fairly and adequately protecting the interests of the Plaintiff class because Plaintiffs do not have any interests antagonistic to the class. Plaintiffs, as well as the Plaintiff class members, seek to enjoin the unlawful acts and omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation and prisoners' rights litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

99. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of class members is approximately 950, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual

members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

**Fed. R. Civ. P. 23(b)(2)**

100.  This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this complaint are common to and apply generally to all members of the class, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class. All state-wide health care policies are centrally promulgated, disseminated, and enforced from the central headquarters of WDOC by Defendants Carr, Hoy and Roberts and further promulgated, disseminated and enforced at WCI by Defendants Hepp and Pushich. The injunctive and declaratory relief sought is appropriate and will apply to all members of the Plaintiff class.

**Medical Subclass**

101.  Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "Medical Subclass") who are now, or will in the future be, subjected to the medical care policies and practices of the WDOC and WCI. "Medical care" includes care related to hearing and vision.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

102.  The Medical Subclass is so numerous that joinder of all members is impracticable. As of October 26, 2023, there are approximately 950 prisoners in the custody of WCI prison, all of whom are dependent entirely on Defendants for the provision of medical care. Due to

28

Defendants' policies and practices, all WCI prisoners, numbering in the hundreds annually, receive or are at risk of receiving inadequate medical care while in WCI prison.

103. The Medical Subclass members are identifiable using records maintained in the ordinary course of business by WDOC and WCI.

## Commonality: Fed. R. Civ. P. 23(a)(2)

104. There are questions of law and fact common to the members of the Medical Subclass. Such questions include, but are not limited to:

(a) whether Defendants' failure to operate a medical care system providing minimally adequate medical care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b) whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Medical Subclass members who are deprived of minimally adequate medical care. Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

## Typicality: Fed. R. Civ. P. 23(a)(3)

105. The claims of the Plaintiffs are typical of those of the Medical Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

106. Plaintiffs are capable of fairly and adequately protecting the interests of the Medical Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Medical Subclass members, seek to enjoin the unlawful acts and omissions of Defendants.

The Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

**Fed. R. Civ. P. 23(b)(1)(A) and (B)**

107.  Since the number of Medical Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Carr, Hoy, Roberts, Hepp and Pushich.

108.  Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

**Fed. R. Civ. P. 23(b)(2)**

109. Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Medical Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass. All state-wide medical policies are centrally promulgated, disseminated, and enforced from the central headquarters of WDOC by Defendants Carr, Hoy, Roberts, Hepp and Pushich. The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.

**Dental Subclass**

110.  Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all

prisoners (hereinafter "Dental Subclass") who are now, or will in the future be, subjected to the dental care policies and practices of WDOC and WCI.

**Numerosity: Fed. R. Civ. P. 23(a)(1)**

111. The Dental Subclass is so numerous that joinder of all members is impracticable. As of October 26, 2023 there are approximately 950 prisoners in the custody of WCI prison, all of whom are dependent entirely on Defendants for the provision of dental care. Due to Defendants' policies and practices, all WCI prisoners, numbering in the hundreds annually, receive or are at risk of receiving inadequate dental care while in WCI prison.

112. The Dental Subclass members are identifiable using records maintained in the ordinary course of business by the WDOC and WCI.

**Commonality: Fed. R. Civ. P. 23(a)(2)**

113. There are questions of law and fact common to the members of the Dental Subclass. Such questions include, but are not limited to:

(a) whether Defendants' failure to operate a dental care system providing minimally adequate dental care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b) whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Dental Subclass members who are deprived of minimally adequate dental care. Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

114. The claims of the Plaintiffs are typical of those of the Dental Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

31

## Adequacy: Fed. R. Civ. P. 23(a)(4)

115.  Plaintiffs are capable of fairly and adequately protecting the interests of the Dental Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Dental Subclass members, seek to enjoin the unlawful acts and omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

116.  Since the number of Dental Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Carr, Hoy and Roberts. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

117.  Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Dental Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass. All state-wide dental policies are centrally promulgated, disseminated, and enforced from the central headquarters of WDOC by Defendants Carr, Hoy and Roberts. The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.

## Mental Health Subclass

118. Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes bring this action on their own behalf and, pursuant to Rules 23(a),

23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, on behalf of a subclass of all prisoners (hereinafter "Mental Health Subclass") who are now, or will in the future be, subjected to the mental health care policies and practices of WDOC and WCI.

<strong>Numerosity: Fed. R. Civ. P. 23(a)(1)</strong>

119. The Mental Health Subclass is so numerous that joinder of all members is impracticable. As of October 26, 2023 there are approximately 950 prisoners in the custody of WCI prison, all of whom are dependent entirely on Defendants for the provision of mental health care. Due to Defendants' policies and practices, all WCI prisoners, numbering tens of hundreds annually, receive or are at risk of receiving inadequate mental health care while in WCI prison. The Mental Health Subclass members are identifiable using records maintained in the ordinary course of business by the WDOC and WCI.

<strong>Commonality: Fed. R. Civ. P. 23(a)(2)</strong>

120. There are questions of law and fact common to the members of the Mental Health Subclass. Such questions include, but are not limited to:

(a) whether Defendants' failure to operate a mental health care system providing minimally adequate mental health care violates the Cruel and Unusual Punishments Clause of the Eighth Amendment,

(b) whether Defendants have been deliberately indifferent to the resulting harm and risk of harm to Mental Health Subclass members who are deprived of minimally adequate mental health care.

Defendants are expected to raise common defenses to these claims, including denying that their actions violated the law.

<strong>Typicality: Fed. R. Civ. P. 23(a)(3)</strong>

121. The claims of the Plaintiffs are typical of those of the Mental Health Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

### Adequacy: Fed. R. Civ. P. 23(a)(4)

122. Plaintiffs are capable of fairly and adequately protecting the interests of the Mental Health Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Mental Health Subclass members, seek to enjoin the unlawful acts and omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

### Fed. R. Civ. P. 23(b)(1)(A) and (B)

123. Since the number of Mental Health Subclass members is so large, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants Carr, Hoy and Roberts. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

### Fed. R. Civ. P. 23(b)(2)

124. Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Mental Health Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass. All state-wide mental health policies are centrally promulgated, disseminated, and enforced from the central headquarters of WDOC by Defendants Carr, Hoy and

34

Roberts. The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclasses.

## Isolation Subclass

125. Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes bring this action on their own behalf and, pursuant to Rules 23(a), 23(b)(1), and 23(b)(2) of the Federal Rules of Civil Procedure, against Defendants on behalf of a subclass of all prisoners (hereinafter "Isolation Subclass") who are now, or will in the future be, subject by WCI to isolation, defined as confinement in a cell for 22 hours or more each day or confinement.

## Numerosity: Fed. R. Civ. P. 23(a)(1)

126. The Isolation Subclass is so numerous that joinder of all members is impracticable. Each year approximately 3,000 prisoners are subjected to Defendants' policies and practices of denying minimally adequate conditions of confinement while in isolation. The Isolation Subclass members are identifiable using records maintained in the ordinary course of business by the ADC.

## Commonality: Fed. R. Civ. P. 23(a)(2)

127. There are questions of law and fact common to the members of the Isolation Subclass. Such questions include, but are not limited to:

(a) whether Defendants' policy and practice of not providing a housing environment free of debilitating isolation and inhumane conditions to prisoners subjected to isolation violates the Cruel and Unusual Punishments Clause of the Eighth Amendment, (b) whether Defendants have been deliberately indifferent to the Isolation Subclass members' risk of injury and harm from the debilitating isolation and inhumane conditions to which they are subjected. Defendants are

expected to raise common defenses to these claims, including denying that their actions violated the law.

## Typicality: Fed. R. Civ. P. 23(a)(3)

128. The claims of the Plaintiffs are typical of those of the Isolation Subclass, because their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

## Adequacy: Fed. R. Civ. P. 23(a)(4)

129. Plaintiffs are capable of fairly and adequately protecting the interests of the Isolation Subclass because Plaintiffs do not have any interests antagonistic to the subclass. Plaintiffs, as well as the Isolation Subclass members, seek to enjoin the unlawful acts and omissions of Defendants. Finally, Plaintiffs are represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

## Fed. R. Civ. P. 23(b)(1)(A) and (B)

130. Since the number of Isolation Subclass members is approximately 200-300, the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

## Fed. R. Civ. P. 23(b)(2)

131. Defendants' policies, practices, actions, and omissions that form the basis of the claims of the Isolation Subclass are common to and apply generally to all members of the subclass, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the

36

subclass. All state-wide policies on the conditions of isolation are centrally promulgated, disseminated, and enforced from the central headquarters of WDOC by Defendants Carr, Hoy and Roberts. The injunctive and declaratory relief sought is appropriate and will apply to all members of the subclass.

## CLAIMS FOR RELIEF
### First Cause of Action
(All Prisoner Plaintiffs and the Plaintiff Class v. Defendants Carr,
Hoy, Roberts, Hepp and Pushich)
(42 U.S.C. § 1983; Eighth Amendment)

132. By their policies and practices described herein, Defendants subject all prisoner Plaintiffs and the Plaintiff class to a substantial risk of serious harm and injury from inadequate health care. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Plaintiff Class's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

134. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Second Cause of Action
(Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone,
Welch, Dreiling and Burkes ; and Medical Subclass v. Defendants Carr, Hoy, Roberts,
Hepp and Pushich)
(42 U.S.C. § 1983; Eighth Amendment)

135. By their policies and practices described herein, Defendants subject Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes, and the Medical Subclass to a substantial risk of serious harm and injury from inadequate medical care. These policies and practices have been and continue to be implemented by

Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Medical Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

136. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Third Cause of Action
(Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes ; and Medical Subclass v. Defendants Carr, Hoy, Roberts, Hepp and Pushich)
(42 U.S.C. § 1983; Eighth Amendment)

137. By their policies and practices described herein, Defendants subject Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes, and the Dental Subclass to a substantial risk of serious harm and injury from inadequate dental care. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Dental Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

138. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Fourth Cause of Action
(Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes ; and Medical Subclass v. Defendants Carr, Hoy, Roberts, Hepp and Pushich)
(42 U.S.C. § 1983; Eighth Amendment)

38

139. By their policies and practices described herein, Defendants subject Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes, and the Mental Health Subclass to a substantial risk of serious harm and injury from inadequate mental health care. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Mental Health Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

140. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

### Fifth Cause of Action
(Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes ; and Medical Subclass v. Defendants Carr, Hoy, Roberts, Hepp and Pushich)
(42 U.S.C. § 1983; Eighth Amendment)

141. By their policies and practices described herein, Defendants subject Plaintiffs Anderson, Korkowski, Dalberg, Salinas-Leal, Schmitt, Flemming, Natcone, Welch, Dreiling and Burkes and the Isolation Subclass to a substantial risk of serious harm and injury from inadequate physical exercise, inadequate nutrition, inadequate mental health treatment, and conditions of extreme social isolation and environmental deprivation. These policies and practices have been and continue to be implemented by Defendants and their agents, officials, employees, and all persons acting in concert with them under color of state law, in their official capacities, and are the proximate cause of the Plaintiffs' and the Isolation Subclass's ongoing deprivation of rights secured by the United States Constitution under the Eighth Amendment.

142. Defendants have been and are aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct.

## **PRAYER FOR RELIEF**

Plaintiffs and the classes they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants Carr, Hoy, Roberts, Hepp and Pushich, as alleged herein, unless Plaintiffs and the classes they represent are granted the relief they request. The need for relief is critical because the rights at issue are paramount under the United States Constitution and the laws of the United States.

WHEREFORE, the named plaintiffs and the classes they represent request that this Court grant them the following relief:

A. Declare that the suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2);

B. Adjudge and declare that the acts, omissions, policies, and practices of Defendants, and their agents, employees, officials, and all persons acting in concert with them under color of state law or otherwise, described herein are in violation of the rights of prisoner Plaintiffs and the classes they represent under the Cruel and Unusual Punishments Clause of the Eighth Amendment, which grants constitutional protection to the Plaintiffs and the class they represent;

C. Preliminarily and permanently enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them under color of state law, from subjecting prisoner Plaintiffs and the Plaintiff Class to the illegal and unconstitutional conditions, acts, omissions, policies, and practices set forth above.

40

D. Order Defendants and their agents, employees, officials, and all persons acting in concert with them under color of state law, to develop and implement, as soon as practical, a plan to eliminate the substantial risk of serious harm that prisoner Plaintiffs and members of the Plaintiff Class suffer due to Defendants' inadequate medical, mental health, and dental care, and due to Defendants' isolation policies. Defendants' plan shall include at a minimum the following:

1. Staffing: Staffing shall be sufficient to provide prisoner Plaintiffs and the Plaintiff Class with timely access to qualified and competent clinicians who can provide routine, urgent, emergent, and specialty health care;

2. Access: Policies and practices that provide timely access to health care;

3. Screening: Policies and practices that reliably screen for medical, dental, and mental health conditions that need treatment;

4. Emergency Response: Timely and competent responses to health care emergencies;

5. Medication and Supplies: Timely prescription and distribution of medications and supplies necessary for medically adequate care;

6. Chronic Care: Timely access to competent care for chronic diseases;

7. Environmental Conditions: Basic sanitary conditions that do not promote the spread or exacerbation of diseases or infections;

8. Mental Health Treatment: Timely access to necessary treatment for serious mental illness, including medication, therapy, inpatient treatment, suicide prevention, and suicide watch;

9. Quality Assurance: A regular assessment of health care staff, services, procedures, and activities designed to improve outcomes, and to identify and correct errors or systemic deficiencies;

10.Isolation: Prohibition of confinement of prisoner Plaintiffs and the Isolation Subclass under conditions of social isolation and sensory deprivation that put prisoners at substantial risk of serious physical and mental harm. Providing prisoner Plaintiffs and the Isolation Subclass with necessary nutrition and regular outdoor exercise to preserve their physical and mental health.

E. Award Plaintiffs the costs of this suit, and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

F. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction;

G. Award compensatory damages in an amount to be determined for all physical, psychological, mental, and emotional injuries, as well as loss of liberty, sustained by Plaintiffs and the class as a result of the policies and practices alleged herein;

H. Award punitive damages;

I. Award reasonable attorneys' fees, together with the costs of this action; and

J. Award such other and further relief as the Court deems just and proper.

RESPECTFULLY SUBMITTED,

Dated: October 26, 2023.
[electronically signed]

___/s/ *Lonnie D. Story*_____
Lonnie D. Story, Esquire
Attorney for Defendant
STORY LAW FIRM, LLC
Wis. Bar #1121459
732 N. Halifax Avenue, #301
Daytona Beach, Florida 32118
(386) 492-5540
lstorylaw@gmail.com

42